[597 NYS2d 322]

RICHARD ARZU, Appellant, v FRANK ARZU, Also Known as FRANCISCO R. ARZU, et al., Respondents.

First Department, May 6, 1993

88

---

**APPEARANCES OF COUNSEL**

*Gilbert M. Goldman (Ronald Cohen* of counsel), for appellant.

*Martin E. Fiel* for respondents.

**OPINION OF THE COURT**

SULLIVAN, J. P.

Born in 1966 with a condition of stunted growth commonly known as dwarfism, plaintiff was rendered permanently paralyzed from the waist down as a result of an operation performed in 1980. Through his legal representative, he thereafter entered into a substantial structured settlement of his malpractice action against the hospital in which the surgery was performed. When plaintiff reached the age of 18, his guardian turned over $161,718.33, the balance remaining in the account into which the payments called for by the settlement were made. Plaintiff states that he then gave the funds to defendants, his father and stepmother, on their representations that this amount and all future payments under the settlement would be deposited into an account for his sole use and benefit. Beginning in 1984, a total of $618,891.33 (exclusive of interest) was ultimately deposited in a joint account in the names of plaintiff and the defendant father; in December 1989, plaintiff learned that all but about $45,000 had been withdrawn by the father, the only one to transact any business with respect to the account.

In September 1990, plaintiff commenced this action against defendants, alleging misrepresentation and fraud in connection with the settlement monies plaintiff entrusted to the father and seeking $573,891.33 in compensatory damages and

related relief; in conjunction therewith, he obtained an ex parte order of attachment against defendants' real and personal property. Defendants own three parcels of real property in the Bronx. On plaintiff's motion to confirm the attachment, the court found "the allegations regarding defendants' removal of property from the state in order to frustrate creditors or enforcement of a judgment to be conclusory and insufficient to grant the drastic relief of attachment," referred the question of whether defendants are domiciled in the State of New York for a hearing and held final determination of the motion in abeyance pending receipt of the Hearing Officer's report. Subsequently, the court confirmed the Hearing Officer's report, which concluded that defendants are domiciled in the State, and vacated the attachment. This appeal followed. Since we are of the view that plaintiff has made a sufficient showing to warrant the issuance of an attachment under CPLR 6201 (3), we reverse.*

It is undisputed that over a period of five years the father withdrew $573,891.33 from the joint bank account in his and plaintiff's names and placed the funds in another account solely in defendants' names. Defendants contend that the funds were expended on plaintiff's behalf and with his consent. They itemize certain expenses, totalling $461,507.30, which were allegedly incurred on behalf of plaintiff and estimate that plaintiff's expenses for "food, clothing, local transportation, credit cards and other expenses * * * could easily average" an additional $20,000 per year.

Initially, we note that for three of the five years, or until plaintiff reached the age of 21, the father was required to support him. (See, Family Ct Act § 413.) In any event, defendants' claim that the money was used for plaintiff is entirely unpersuasive. With the exception of American Express receipts and cancelled checks totalling approximately $10,000, there is no documentation to substantiate any of these claimed expenditures or any credible explanation for the absence of such documentation. In most cases, there is not even an approximate date as to when the expenditure was incurred. It is particularly difficult to understand how the

* Although plaintiff did not take an appeal from the first order, the issue of whether defendants disposed of property with the intent to defraud creditors (see, CPLR 6201 [3]) is properly before us on this appeal from the order vacating the attachment since the first order held the final determination of the motion to confirm the attachment in abeyance pending completion of the hearing.

father is able to set forth certain expenses in precise amounts —$6,509.50 for "Rehab Equip, Inc.," $318.26 for cable TV, $4,861 for "[a]ssorted med. bills" and $1,420 for "[a]ssorted medicals"—without any written records thereof.

While the father attributes his "casualness" with regard to record-keeping to the father-son relationship, it seems to us that a fiduciary entrusted with such substantial sums, if acting in good faith, would, as a matter of course, keep a contemporaneous account of the funds under his control. Moreover, it is undisputed that plaintiff repeatedly asked defendants for and was refused an accounting of his funds.

We also find questionable the expenditure of $125,600 attributed to housekeepers, home attendants and a private tutor for plaintiff. The persons who allegedly performed these services are all relatives of the father and were paid in cash. In addition, plaintiff's physician at the Rusk Institute for Rehabilitation Medicine submitted an affidavit stating that at all relevant times plaintiff did not need any assistance in taking care of his personal needs and that, in any event, an aide would not be required for more than one or two hours a day.

The claim that the funds were expended for plaintiff's use and benefit is not only undocumented, but defies common sense as well. "[A] court is not required to give credence to a story so inherently improbable as to leave no doubt that it is not true." *(Marti v New York City Hous. Auth.,* — AD2d —, —, 1993 NY Slip Op 3026 [1st Dept, Apr. 22, 1993].)* While defendants describe plaintiff as having "a flair for the good life and indulg[ing] himself * * * with luxuries," there is no suggestion in this record that plaintiff maintains an extravagant life style. No explanation has been offered as to the disbursement of either an $85,000 withdrawal made less than two weeks after the initial deposit of $161,718.33 into the joint account or of the withdrawal of a total of more than $153,000 within the first four months. Over the five-year period from the time plaintiff reached his majority until he became aware that the account had been depleted, the father made withdrawals averaging in excess of $114,000 per year. These withdrawals seem particularly prodigious when contrasted with the $39,000 or so disbursed for plaintiff's use and benefit during the 1½ years in which the guardian administered plaintiff's estate.

In addition, the father's schedule of expenditures is replete with examples of double billing. For instance, despite the fact

that, in 1984, he received approximately $9,200 from plaintiff's guardian for renovation of an apartment for plaintiff, the father nevertheless includes among his expenses $10,000 for this renovation. He also allocates for the year 1984 some $7,200 in rental expenses, $5,700 in "cash to Richard," $4,400 for a housekeeper and $9,600 for a home attendant. The final judicial accounting rendered by the guardian encompassed all of that year and would presumably include all of the expenses the father incurred on plaintiff's behalf during that period for which he was entitled to be reimbursed.

It should be noted, as developed at the hearing, that in or about 1988, the father obtained a license from the government of his native Belize in Central America to organize a cable television company there. In fact, that same year, the father quit his job as a cable television technician, and plaintiff's stepmother, who owned a beauty parlor in the Bronx, sold the business and subsequently shipped the equipment to Belize. Plaintiff claims that both his father and stepmother moved to Belize in 1988 and started the cable television business there with his money. The father admits that he used "approximately $50,000 to $60,000 [of plaintiff's] money in furtherance of" the cable television business, but asserts that he did so with plaintiff's consent, knowledge and permission. However, plaintiff denies that he authorized the removal of such funds for the father's benefit. More significant, plaintiff was given no interest in the business, while two other of the father's children were each alloted 25 shares.

Insofar as relevant, an attachment may be granted when "the defendant, with the intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." (CPLR 6201 [3].) The property in question may be that of the plaintiff which the defendant has taken wrongfully. *(Adam Hat Stores v Lang,* 155 Misc 587, 588 [App Term, 1st Dept]; 29 NY Jur 2d, Creditors' Rights and Remedies, § 39.) In addition, the plaintiff must also show a probability of success on the merits in the underlying action. *(See, Societe Generale Alsacienne De Banque v Flemingdon Dev. Corp.,* 118 AD2d 769, 772.)

As a preliminary matter, a creditor is "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." (Debtor and Creditor Law § 270.) Therefore, as soon as the father withdrew funds

from the account he held with plaintiff for an unauthorized purpose, the latter became his creditor within the meaning of CPLR 6201 (3).

In light of the father's patently incredible and almost entirely undocumented explanation as to what happened to hundreds of thousands of dollars belonging to plaintiff and exclusively within his control as a fiduciary, it is reasonable to infer that defendants disposed of or secreted at least some of plaintiff's property. Their failure to provide plaintiff with an ongoing accounting or, at the very least, come forward with a contemporaneous record of the disposition of plaintiff's funds entitles us to conclude that they acted with an intent to defraud plaintiff, their creditor. *(See,* CPLR 6201 [3].) " '[I]t is not always practicable to establish by proof the existence of a fraudulent intent on the part of the debtor even when in reality it exists. Direct proof of the fact can rarely be obtained, and when it is established it must ordinarily be inferred from circumstances'." *(Stewart v Lyman,* 62 App Div 182, 186, quoting *Stevens v Middleton,* 26 Hun 470, 472; *see also, Marine Midland Bank v Murkoff,* 120 AD2d 122, 128.) We are also of the view that under these facts the inference that defendants are "about to do" one of the acts specified in CPLR 6201 (3) is warranted and that an attachment can therefore be justified on that ground as well.

Finally, the facts of this case lead us to conclude that plaintiff will probably succeed on the merits in the underlying action seeking, *inter alia,* recovery of the funds wrongfully removed from his account.

Accordingly, the order of Supreme Court, Bronx County (Howard R. Silver, J.), entered February 11, 1992, which, *inter alia,* vacated an ex parte order of attachment against defendants, should be reversed, on the law and the facts, with costs and disbursements, the motion to confirm the attachment granted and the attachment reinstated.

MILONAS, ROSENBERGER, ROSS and ASCH, JJ., concur.

Order of Supreme Court, Bronx County, entered February 11, 1992, which, *inter alia,* vacated an ex parte order of attachment against defendants, is reversed, on the law and the facts, with costs and disbursements, the motion to confirm the attachment granted and the attachment reinstated.